The Chancellor.
The answer of Edsall and L’Hommedieu admits that they are in possession ; and the character of their possession. That Edsall took possession as mortgagee; and that L’Hommedieu, afterwards, as purchaser at the sheriff’s sale, and as trustee for the creditors, took possession of the premises not included in Edsall’s mortgage, and also of the Clinton mine farm; and that they, afterwards, agreed to unite in putting the property in repair and the furnace in blast, and in carrying on the business. L’Hommedieu admits he bought the Clinton mine farm and the property of the Hamburgh Company, at the sheriff’s sale, under the powers and instructions, and for the sole purposes stated in the agreement of December 7th, 1838, and as trustee for the creditors therein named. Edsall, then, is accountable for the rents and profits of what he is in possession of; and- unless something has taken place to divest *312 the right of the Hamburgh Company and vest it in another, he is accountable to them. And L’Hommedieu holds subject to account as trustee, and to be called upon to convey to the beneficial owners.
But these defendants deny that they, or either of them, are subject to account to the complainants, or either of them, or that the complainants, or either of them, have any right to redeem; and say,- that the persons entitled to redeem, as against Edsall, and to call L’Hommedieu to account as trustee, are certain creditors of the Hamburgh Company, including L’Hommedieu and Edsall, who entered into the agreement of December 7th, 1838,- for the purchase of the property by L’Hommedieu as their trustee, at the sheriff’s sale. This is so, if that sale can be sustained in equity.
On and before December 7th, 1838, the sheriff of Sussex had in his hands against the Clinton Manufacturing Company a fi. fa. issued out of the common-pleas of Sussex, in favor of Robert Lewis and Joseph M. Brown, for $1008 27, and an execution from chancery, in favor of Nathan Smith, on a decree on a foreclosure bill, dated March 25th, 1836, for the sale of so much of the’ mortgaged premises as would be sufficient to pay the amount of the decree and costs. Under these two executions the sheriff had advertised the Clinton mine farm, containing one hundred and nine acres and fifty-seven hundredths, and the sale stood adjourned to the said 7th of December, 1838. There was due on the two executions, including interest, costs and sheriff’s fees, but about $3500; and the incumbrance on which the decree in chancery was founded was the first incumbrance; so that the purchaser at that sale would get a clear title. Both L’Hommedieu and Edsall had valued this mine farm, about a month before, at $50,000, as appears by certificates under their hands, given in evidence. On this mine farm Edsall held a subsequent mortgage, dated January 10th, 1838, for $4000. This farm was sold, at said sheriff’s sale, for $4041.
The same sheriff had in his hands, at the same time, five executions, on judgments at law, against the property of the Hamburgh Company, on which he had also advertised their property for sale, viz.
*313 X E. Edsall’s execution, tested Nov. 29¡ 1887, lor ¡§X9M 85 John Givans’c execution, tested Dec. 1, 1837, for 131 18 Win. Jackson’s execution, tested 3d Tuesday in August, 1838, for 816 48
Stephen Wray’s execution, tested 1st Tuesday in September, 1838, for I07S 75
Davenport’s execution, tested the same day, for 2861 55 Amounting, in all, to §6815 78 The answer of Edsall and L’Hommedieu says, that these defendants, L’Hommedieu and Edsall, and other creditors of the Hamburgh Company, deeming it important to the security of their claims against the Hamburgh Company that the Clinton mine, from which the Hamburgh Company got their ore, should be bought for tho benefit of the Hamburgh furnace | and despairing of Pratt’s being able to pay or secure their debts, met, several weeks before the day appointed for the sale of the Clinton mine farm, to consult as to the best means of securing their debts; and that it was then agreed among' said creditors of the Hamburgh Company, that if the Clinton mine tract and the Hamburgh property should be sold on executions, they would appoint one of their number to buy the same, for the benefit of such of the creditors as should become parties to the agreement, in case no one should, at the sale, offer enough to-pay the incumbrances and secure the said creditors 5 and that, at that meeting, the said creditors settled on most of the principles of the articles of agreement afterwards executed on the 7th of December, 1838.
The arrangement of these certain Hamburgh creditors, then* was this j that, lest the Hamburgh property should not bring enough to pay their debts, they would appoint oae of their number to buy the Clinton mine and the Hamburgh property. But how would the purchase of the Clinton Company’s mine help pay the debts of the Hamburgh creditors, if it was bought at its fair value ?
This part of the answer further says, that the debts and Incumbrances against the Hamburgh property, to the best of the knowledge and belief, &c., exceeded §30,000, and that the debts of the Clinton Company existing as liens on the Clinton mine tract, exceeded §10,000. What liad the liens on- the Clinton *314 mine tract to do with the Hamburgh creditors ? And how is the amount of liens on the Clinton mine tract to account for tho hid at which it was struck' off, it being sold on a decree on the first incumbrance?
Again, as to the Hamburgh lands, the answer says* the debts and incumbrances against the Hamburgh Company exceeded $30,000. What were the incumbrances to which they would be subject in the hands of the purchaser at the sheriff’s sale ? The answer does not tell us.
The plain meaning of the arrangement made by those of the Hamburgh creditors who entered into the agreement of December 7, 1838* was, that-the Clinton mine farm was to be bought as a means of securing their debts against the Hamburgh Company ; which necessarily carries the idea that it was to be bought for less than it was worth; and prepares us against surprize from- the testimony showing the means taken to prevent competition at the sale.
The agreement of December 7, 1838, is signed by L’Hommedieu for himself and as trustee, and by Edsall for himself and William Riggs, and by eighteen other creditors of the Hamburgh Company, by themselves, their attornies or assignees. Edsall held, at the time, a subsequent mortgage on the Clinton mine farm, which would be cut off by the sale. Would he have suffered this mine farm, of the value of which his own estimate was $50,000, to be struck off to another, or to a trustee for these Hamburgh creditors, for $4041, without some arrangement by which his subsequent mortgage was to be provided for? Certainly not. And accordingly, the agreement itself authorizes the trustee, who was to buy at the sheriff’s sale free from this mortgage, to purchase and procure it from Edsall; and authorizes the trustee to raise, by bond and mortgage on the properties to be-purchased, after they should be purchased by him for the said creditors* sufficient moneys to pay the purchase money thereof, and also sufficient to purchase and pay for the two Winslow mortgages and the Sharp mortgage on the Ham-burgh property. And it appears, by an indorsement oh the back of the Edsall mortgage, dated December 10th, 1838, two or three days after the sale of the Clinton property to L’Hommedieu, the said trustee, that Edsall assigned his said mort *315 gage, and the bond it was given to secure, to L’Hommedieu, for $4220, acknowledged to have been received by him from L’Rommedieu. By this arrangement Edsall was silenced as a bidder, and it carries on its face an admission of these agreeing creditors, that they coaid pay, at least, 68200 for the Clinton inioe tract, and that its value beyond that would he a means of securing’ their debts against the Hamburgh Company. Bat what is the effect, beyond this, of this transaction, on the Clinton Company and its creditors ? It is this: the Clinton Company and its creditors have had their property, valued by two of the very purchasers at $50,000, taken from them, by this arrangement, for $404!, .and this bond to Edsall still remains a debt against them.
But this was not, all that was done to prevent competition at these sales. What liad been done with and for Edsall could not be relied oa as sufficient, to secure to these agreeing Hamburgh creditors the purchase of the properties of the two companies, at prices suited to their purposes. Something was necessary to he done to induce Pratt to use means to prevent competition ; and the evidence showing what was done for this purpose is so consistent with the occasion and the purposes of these creditors, that there can be no good reason for doubting it. ('flic evidence on tins part of the case is here examined.)
It is certain that, after the sale, a lease was made to Pratt, for three years,, and a contract entered into by L’Hommcdieu with Pratt, to convey to him the whole Hamburgh property and the Clinton mine tract, for $30,000, by deed of release, with the usual covenants against his own acts. The mortgages which then existed on parts of the Hamburgh property, amounting to $7701 75, were to be considered as part of the said $30,000. And this contract was made by L’Horrnnedieu, who was trustee of all the said property for the Hamburgh creditors who entered into the agreement of December 7th, 1838. This is, of itself, evidence that the lease to and contract with Pratt were made in conformity with an understanding had and made before the sales. But the evidence is clear that there was such an understanding. True, the agreement of December 7th, 1838, did not state in terms, that the lease and contract to convey should bo made to Rratt. It authorizes and diroots the *316 trastee to lease .all the Hamburgh property and the Clinton mine “ to some suitable competent person.” The reason why Pratt’s name was not inserted is obvious, and is shown by the testimony. The legal adviser saw that it would be putting on the face of the agreement evidence of the arrangement with -Pratt, :to enable these agreeing Hamburgh creditors to succeed in adding the Clinton mine farm to the Hamburgh property, at ¡their ow,n price. It is evident from what passed before the sale, that Pratt relied on getting this lease and contract; and he did get them. And it cannot be disguised, under the circumstances and testimony in ,the cause, that he got them in pursuance of .an understanding between him and the agreeing Hamburgh' .creditors had before the sale. The. result, the ¡fact -that the •Clintqn .mine farm was struck off to L’Hommedieu for $4041, free from all incumbrances, and all .the Hamburgh property for $285, subject only to .the mortgages, shows it. But there is an .amount of evidence on ¡this point that cannot be resisted.
The agreement among the creditors •themselves is one thing. The agreement or understanding;had before the sale) between ¡those.creditors and Pratt, is another. The lease and the privilege of .purchasing were to go together: this is shown by the .agreement itself, in which,the Hamburgh .creditors -who signed .it united. And that Pratt .was to be the lessee and have the; .said privilege, and that it was .so understood and agreed before .the sale, ¡there.can be ¡no doubt. (The ¡testimony o.n .this point .is here .examined.,)
The answer of Mr. Haines shows, very plainly I,think, the .same thing.
The .testimony shows, that it was known among the agreeing Hamburgh creditors, when the agreement among themselves .was drawn, that Pratt’s name could not be safely put in that Writing, and that it was considered that it would vitiate the sale.
There was good reason for ¡the caution .used in not putting Pratt’s natne in the writing, as lessee with the .privilege of purchasing. But lie was to he the .man, and he and the agreeing .creditors so understood it. And .the lease with ¡the said .privilege was, accordingly, afterwards executed to him.
There was, then, an understanding before the sale, which ¡prevented a fair competition at the sale, and resulted in. the *317 sacrifice of the property. It ia not necessary to advert particularly to what was said before the sale commenced, and while it was going on, to persons attending the sale, to prevent their bidding. Enough was done and said to effect the object of these agreeing creditors; and it was effected.
Under such an arrangement, and in view of the ‘effect produced by the arrangement, the sale of the Clinton farm was unlawful as against the Clinton Company and its creditors; and the sale of the Hamburgh property unlawful as against the Ham-burgh Company and its creditors. It would not only be disastrous in its consequences, but it would 'be a reproach upon the courts, to allow property to be sacrificed at sales on executions, by means of such arrangements to prevent fair competition.
It is unnecessary to consider that part of the argument for the defendants based on the idea of Pratt’s abandonment. The sale was unlawful from what passed before the sale.
The Hamburgh property, as before stated, was to be sold on five executions at law, of which Edsall’s was -the oldest. The purchaser at the sheriff’s sale would get-the property free from the liens of these executions, and subject only to the mortgages. Under the arrangement made between -the agreeing Hamburgh creditors, among themselves, and between them as a body and Pratt, the furnace lot of fifty acres, was struck off at $26 ; the lot. of woodland in Vernon and Hardiston, of seventy acres, at one dollar; another wood lot in Vernon of one hundred and seventy-five acres, at one dollar; another wood lot in Vernon, of fifty-five acres, at fifty-five cents ; another wood lot in Vernon, of one hundred and seven acres, at eleven dollars; another wood lot in Vernon, of forty-five acres, at sixty-five dollars; another wood lot in Vernon, of nine hundred acres, at sixty-eight cents; and a lot in Hardiston, of one and a half acres, on which was a storehouse and other improvements, at $180: so •that the sale of all these eight tracts brought but $285 for the judgment creditors, neither of whom was a party to the arrangement, nor present at the sale, except Edsall; and his debt was, by the terms of the arrangement, to be paid.
Joseph Sharp attended the sale, for the purpose, as he says, of buying the lot on which he had a mortgage, with the view of saving the expense of a foreclosure. He says he did not bid *318 ■because he was told at the sale, by the creditors, that it was agreed that L’Hommedieu-should buy the property for the benefit of’the creditors and the company: in another part of his testimony’he says, for the benefit of the creditors and Pratt. He says his chief conversation on the subject was with Robert Lewis, Joáeph M. Brown, and William Edsall, all creditors who had signed the agreement,.and none of them having judgments •against the Hamburgh Company. Edsall, too, had mortgages on different parts of the Hamburgh property, and had the same inducement to bid, had it not been for the arrangement.
The effect of the arrangement and the sale under it, on the Hamburgh judgment creditors, -was, to displace their liens, and substitute for the liens of their judgments, a lien for the book accounts of the agreeing Hamburgh creditors, in the shape of a title in their trustee, L’Hommedieu.
Again, Edsall had the first judgment lien. Would he have allowed all these Hamburgh lands to be struck off to L’Hommedieu at such bids, but for the arrangement that was made? By that arrangement -he was to get the amount of his judgment. By the agreement, the debts of the agreeing creditors, of which he was one, were to be paid out of the lands, including the Clinton mine farm, or out of the money which was to be raised by mortgage on the Hamburgh property and the Clinton farm.
The' case appears to me to ho very clear against the defendants. They cannot hold these properties against these companies and their respective creditors. Nothing can be done by the court in this suit, and with the parties we have before us in it, in reference to the Clinton mine farm. It cannot go to Pratt. It would be as unavailable to the Clinton creditors in his hands as where it now is. Nor can it go to Pratt’s assignees under the insolvent act, to pay his individual debts. And the receivers of the Clinton Company are not before us in this suit. As to the property of the Hamburgh Company, it will be declared that L’Hommedieu holds it in trust for the creditors and the Company ; and it will be referred to a master to take an account of the issues and profits of the property, and of the debts ; and all further directions will be reserved until the coming in of the master’s report. .